UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re Ex Parte* Application of *Duet Group Limited*,<br><br>Applicant,<br><br>For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery from Colony Capital, LLC for use in a Foreign Proceeding. | Case No._____ |

### EX PARTE APPLICATION OF DUET GROUP LIMITED FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 GRANTING LEAVE TO OBTAIN DISCOVERY FOR USE IN A FOREIGN PROCEEDING

Duet Group Limited ("Duet") makes this Application for an order, pursuant to 28 U.S.C. § 1782, granting it leave to serve a subpoena for the production of documents upon Colony Capital, LLC ("Colony") related to a foreign legal proceeding (the "English Action") Barthélemy Holdings LLC ("Barthélemy") maintains against Duet.

### NATURE OF THE APPLICATION

1. This is a limited-purpose action to obtain evidence of communications by and between Colony and Barthélemy, as well as Colony's own internal communications. (Declaration of John Paul Fulco (submitted in support of this Application), Par. 2). Barthélemy, Duet Trust and Fiduciary Services S.A. ("DTFS") and Duet (solely as guarantor of DTFS's obligations) were parties to a series of investment agreements[1] for the development of a luxury hotel on the French Caribbean island of Saint Barthélemy (the "Hotel"). (Fulco Decl., Par. 2). Colony owned and controlled a special purpose entity (Colfin Grand-Cul-de-Sac Funding S. a r. l., a Luxembourg entity ("Colfin")) which loaned money to both the holding company

---

[1] The investment agreements that are the main focus of the English Action are dated August 14, 2012 and December 23, 2014.

developing the Hotel, and to DTFS with respect to its development of two villas ("Villa Loan") abutting the Hotel project. (Fulco Decl., Exh. A, Claim, Par. 12; Exh. B, Defence, Par. 15).[2]

2. While Duet was attempting to work out a forbearance agreement as to the Villa Loan in April 2016, Colfin foreclosed upon shares Duet had pledged in DTFS, becoming the owner of DTFS and its interest in the villas and the Hotel project (of which, by that time Barthélemy had taken over complete control). (Fulco Decl., Par. 3). In short order, Colony then sold the foreclosed interest to Barthélemy's affiliate for below fair market value. (Fulco Decl., Par. 3). Duet asserts and the evidence exchanged to date supports that this was not simply fortuitous. This was not serendipity. Instead, this was a planned effort by and between Barthélemy, its affiliate and its principal, Mark Nunnelly, to interfere with DTFS's forbearance negotiations with Colfin, encourage Colfin's foreclosure and use Colfin's foreclosure as the pretext for its plot to cheat DTFS out of its interest in the villas (and undeveloped plot) and the Hotel. (Fulco Decl., Par. 3).

3. As described more fully below, the information Duet seeks bears upon its defenses and counterclaim in the English Action, specifically: that (a) Barthélemy was fully aware of the progress of the Hotel development, as well as its cost, and having participated in all decisions concerning the project, *Barthélemy* was responsible for any Hotel development issues (Defence, Par. 54); (b) Barthélemy, its affiliate and Nunnelly improperly interfered with Duet's negotiations with Colfin to forbear from foreclosing on Duet's pledged shares in DTFS; (c) Barthélemy breached its duties of cooperation under the investment agreements and in equity by failing to repay the loan, and further contending that repayment required its approval – which it refused to authorize; and finally (d) Barthélemy, its affiliate and Nunnelly encouraged Colfin to

---

[2] DTFS also owned the land for the development of a third villa, which was conditionally sold to Barthélemy in 2014.

2

foreclose and, upon Colfin's foreclosure, Barthélemy purchased Colfin and the foreclosed interest (which Duet had pledged and was the subject of the foreclosure) in the villas (including the undeveloped plot) and the Hotel project, at a fraction of fair market value. (Defence, Pars. 89-90, 97-98).

4. Barthélemy is controlled by Mark Nunnelly (an American investor and former Managing Partner at Bain Capital, LLC), his wife Denise Dupré, family and family trusts and is managed by David Tanner. (Fulco Decl., Par. 5; Defence, Par. 2). Accordingly, in the English Action, Barthélemy identified Nunnelly, Dupré and Tanner as relevant Barthélemy custodians (the "Barthélemy Custodians") from which it has provided disclosure. (Fulco Decl., Exh. C). Duet now seeks communications by and between the Barthélemy Custodians and Colony and its agents.

5. Based upon Barthélemy's own disclosure in the English Action, it is incontrovertible that the Barthélemy Custodians had communications with Colony's David S. Schwartz, Managing Director of Colony, Kevin M. Moosbrugger, Associate Vice President of Colony, Jonathan Kasirer, upon information and belief Associate Vice President of Colony, and Terry Scanlon, Colony's construction consultant (together, the "Colony Custodians") – on matters that bear upon Duet's defenses and counterclaim in the English Action. (Fulco Decl., Par. 6). These are the communications as to which Duet seeks discovery.

6. As Colony is not a party to the English Action, and is outside the jurisdiction of the Court in the English Action, the Court in the English Action cannot compel Colony to produce the requested discovery. In addition, upon information and belief, as Barthélemy does not have custody, possession or control over the Colony and Colfin documents at issue, it cannot be compelled by the Court in the English action to produce the Colony Custodians'

communications with the Barthélemy Custodians or the Colony Custodians' communications with one another. The scope of Duet's request is entirely reasonable and lawful, and there is simply no other way for Duet to obtain the requested information. Hence, Duet is compelled to make this Application.

## THE RELEVANT ENTITIES, JURISDICITON AND VENUE

7. Duet is a Hong Kong limited company.

8. Non-party Colony Capital, LLC is a corporation organized under the laws of the State of Delaware. (Fulco Decl., Par. 8, Exh. D).

9. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, specifically 28 U.S.C.§ 1782.

10. This Court is the proper venue for this action, because Colony is organized under the laws of this State and can be found in this District.

## BACKGROUND OF THE ENGLISH ACTION

11. As mentioned above, Barthélemy, DTFS and Duet were parties to a series of investment agreements for the development of the Hotel, the construction of which was completed in the second-half of 2016. (Fulco Decl., Par. 10).

12. On June 12, 2017, Barthélemy initiated the English Action against Duet that is now pending with the High Court of Justice, Queen's Bench Division, Commercial Court in England under claim number CL-2017-000370. (Fulco Decl., Par. 11).

13. The English Action arises out of Duet's alleged breach of certain guarantees of DTFS's warranties and obligations to Barthélemy under the investment agreements for the development of the Hotel. (Fulco Decl., Par. 12). Barthélemy asserts, *inter alia*, that DTFS breached certain warranties allegedly given as to the Hotel Budget, the completeness of

information provided to Barthélemy, and specifications as to the Hotel. (Fulco Decl., Par. 12, Claim, Pars. 26, 30-36 and 37-42). It further asserts that DTFS failed to pay for certain costs and fund certain obligations under the investment agreements which Duet guaranteed. (Claim, Pars. 43-48). Barthélemy's claims against Duet are based solely upon DTFS's alleged breaches and Duet's alleged failure to make good on its guarantee of DTFS's warranties. (Claim, Par. 27).

14. Duet filed defenses and a counterclaim in the English Action, as well as amended defenses and a counterclaim (references herein are solely to the amended pleading). (Fulco Decl., Par. 13). Duet asserts that, as a result of holding a substantial ownership interest in the holding company through which the Hotel project was being developed, from 2012 to 2014 Nunnelly and Dupré held two of the four positions on the development's management committee, and then from 2014 onward, Barthélemy controlled six of the seven positions. (Defence, Pars. 8(b) and 23(d)). Duet further asserts that the management committee, and by extension Barthélemy, was involved in the management and decision-making concerning the development of the Hotel. (Defence, Pars. 8(b)(c)(d)(e) and 16(d)(e)(f)). It is Duet's position that (i) the Hotel Budget, the accuracy of which was warranted by DTFS, was approved by Nunnelly and Dupré (Defence, Para 8(g)), and (ii) DTFS did not breach the Hotel Budget Accuracy Warranty (Defence, Par. 51(a)). Further, Duet contends that DTFS did not breach the Hotel Specification Warranty in the 2012 and 2014 Investment Agreements. (Defence, Pars. 57(b) and 60). Indeed, Barthélemy *itself* is responsible for any development issues. (Defence, Par. 54).

15. As a result of Colfin's foreclosure of Duet's pledged shares in DTFS and Barthélemy's purchase of Colfin through its affiliate (LEBV Holdings LLC ("LEBV"), a Delaware limited liability company (Fulco Decl., Exh E)) in August 2016, Barthélemy now owns

and controls DTFS and Duet's interest therein, including its interest in the villas (and the undeveloped plot) and the Hotel project. (Claim, Par. 24, Defence, Par. 43).

16. Duet asserts a counterclaim that Barthélemy's seizure of Duet's interest in the villas and the Hotel project was all the result of a premeditated conspiracy beginning as early as the Fall of 2015 to interfere with and derail Duet's forbearance negotiations, encourage Colfin to foreclose, and purchase Colfin after it had foreclosed, resulting in a windfall to Barthélemy and constituting a breach of Barthélemy's obligations under its investment agreement with DTFS and Duet and principles of equity. (Defence, Par. 97).

17. The parties to the English Action have recently been engaged in the English discovery process, known as disclosure, and have exchanged documents, but as set forth above, an Order from this Court is the only means by which Duet can obtain its requested discovery. (Fulco, Decl., Par. 17).

### *The Hotel Agreements and Barthélemy's Management of the Project*

18. Barthélemy, DTFS and Duet entered into an investment agreement, dated August 14, 2012 (the "2012 Agreement"), for the development of the Hotel in which Barthélemy held a 44.44% interest and DTFS held a 55.66% interest in the project. (Claim, Par. 11). DTFS was designated as the sponsor in the 2012 Agreement. (Claim, Par. 10). The 2012 Agreement was superseded by a 2013 Agreement, and an investment agreement, dated December 23, 2014 (the "2014 Agreement"). (Claim, Par. 14 and 19). As a result of the 2014 Agreement, Barthélemy held a 78.75% interest and DTFS held a 21.25% interest in the project. (Defence, Par. 22).[3] Duet guaranteed a number of DTFS's warranties under the 2012 Agreement and 2014 Agreement. (Claim, Par. 27). However, Barthélemy was, at all times, an active investor in the

---

[3] On the same date as the 2014 Agreement, DTFS entered into an agreement with Barthélemy for the sale of, *inter alia,* DTFS' remaining (indirectly held) interest in the Hotel, taking Barthélemy's interest in the Hotel to 100%.

6

Hotel project. (Defence, Pars. 8(j) and Par. 16(i)).

19. While DTFS was tasked with managing the development of the Hotel, its management and the project's 2012-2013 and 2013-2014 business plans, as well as all major contracts were at all times subject to the oversight and approval of the management committee which included Nunnelly and Dupré as representatives of Barthélemy. (Defence, Pars. 8(b), (c), (d), (e), (f), (g) and 16(d), (e), (f), (g), (h)).

20. Given Colony's interest as a lender to the Hotel project and the villas development, it maintained a close watch on the progress and financial viability of each. Indeed, it appointed Scanlon as its own construction consultant to oversee and monitor the construction of the Hotel and later the villas. (Defence, Par. 16(j)). Colony's consultant extensively reviewed the Hotel Budget and made a number of recommendations which were approved by the management committee. (Defence, Par. 16(k)).

### *The 2014 Agreement – Barthélemy Takes Control*

21. By 2014, it was evident that Barthélemy and Duet had very different goals and visions for the Hotel. (Defence, Par. 21). In short, for Barthélemy this was a vanity project, a trophy to serve as an homage to Dupré's work in the hotel and restaurant business. (Defence, Par. 21). For Duet, however, this was a real-world project with real-world investor dollars. (Defence, Par. 21). It wanted to complete the Hotel project as a five-star resort, but it wanted to do so as quickly and efficiently as possible. (Defence, Par. 21). For Duet this was business. It was not about stroking anybody's ego. (Defence, Par. 21).

22. As a result, the parties entered into the 2014 Agreement to reflect their new deal. (Defence, Par. 23). Under the 2014 Agreement and related agreements, Barthélemy agreed to provide any additional necessary funding for the project, purchased DTFS's interest in the

7

project and further agreed to purchase DTFS's interest in the undeveloped land for the third Villa. (Defence, Pars. 22, 23 and 29). This gave Barthélemy a 100% interest in the Hotel project, and left DTFS with the two villas and a 21.25% security interest in the Hotel. (Defence, Pars. 23 and 29). In addition, the Hotel project was no longer managed by DTFS under the oversight of the management committee, since Barthélemy held six of the seven management committee positions, with only one position being held by DTFS. (Defence, Par. 23(d)). Thus, beginning with and continuing from December 2014 to present, Barthélemy (and by extension Nunnelly) has had complete and total control over the Hotel project. (Defence, Par. 23(e)).

### *The Foreclosure*

23.    The two DTFS villas were completed in 2015, but they could not be sold because they were covered by the same development permit as the Hotel, and due to Barthélemy's new and expanded plans for the Hotel, it was not complete. (Defence, Par. 32). As a result, Colfin agreed through three forbearance agreements to extend the maturity of the Villa Loan (which originally matured in October 2015) to April 1, 2016. (Defence, Par. 33). By March 2016 the Hotel was still some months from completion. (Defence, Par. 33). Colfin had indicated it was willing to extend the maturity of the Villa Loan again, and the parties had agreed in principle upon the terms for such an extension. (Defence, Par. 33). But, without any explanation, on April 13, 2016 Colfin changed its position and foreclosed on the Villa Loan by and through an action on Duet's pledged shares in DTFS. (Defence, Par. 34).[4]

24.    By reason of Colfin's foreclosure, it obtained Duet's interest in DTFS and thereby its interest in the two developed villas and the one undeveloped plot, as well as its interest in the Hotel project. (Defence, Par. 35). In so doing, Colfin obtained assets worth

---

[4] Colfin's enforcement actions taken with respect to the Share Pledges have been challenged in the Luxembourg courts in a currently pending action.

approximately €50 million in discharge of a total debt of around €21.5 million (including interest and charges). (Defence, Par. 36). If Colony had indicated it was not willing to agree to a further extension, Duet could have and would have timely obtained refinancing to repay the Villa Loan. (Defence, Par. 33).

25. It is now clear that throughout the negotiations between the Duet and Colfin, Barthélemy was in undisclosed active negotiations with Colfin seeking to acquire all three villas and Duet's interest in the Hotel project at substantially below their true value. (Defence, Par. 40). The foreclosure and sale were prompted or encouraged by the prior intervention of Barthélemy. (Defence, Par. 34).

26. From December 2015 onwards, Nunnelly and Dupré had been considering along with their management team at Barthélemy the value that would be generated if the villas were managed as part of the Hotel. (Defence, Par. 33A). By March 2016 at the latest, Nunnelly had concluded that Barthélemy should seek to acquire DTFS's interest in the development (including the villas). (Defence, Par. 33A). He believed that the simplest and best route to do this was for Colfin to foreclose on Duet's pledged shares in DTFS and then for Colony to sell Colfin to Barthélemy's affiliate. (Defence, Par. 33A). This would allow Barthélemy to acquire DTFS's interest in the development for a fraction of its market value. (Defence, Par. 33A).

27. Unbeknownst to Duet, in order to encourage Colfin to foreclose, rather than extend the Villa Loan, on or about April 12, 2016 (the day before Colfin foreclosed), David Tanner advised Colfin that Barthélemy was willing to purchase the collateral for the Villa Loan at a sum equaling or exceeding the amount then outstanding under the Villa Loan. (Defence, Par. 33). Negotiations as to the terms of the purchase of the collateral began on the morning of April 13, 2016 (the day of Colfin's foreclosure) between lawyers for Barthélemy and lawyers for

9

Colfin, all of which was concealed from the Duet. (Defence, Par. 33B). Following the foreclosure, Barthélemy and Colfin continued to engage in covert discussions about purchasing the foreclosed assets. (Defence, Par. 38).

28. In the various discussions between Duet and Colfin, from April 13, 2016 onwards, Duet clearly communicated that it was ready willing and able to repay the Villa Loan and, despite being denied access to the corporate paperwork and access to the villas, within a few weeks of the foreclosure obtained financing of €20 million from GarantiBank, which it placed into escrow ready to repay the Villa Loan. (Defence, Par. 39). The only reason these funds had not been raised earlier was because Colfin had expressed a willingness to extend the Villa Loan. (Defence, Par. 39).

29. Furthermore, Barthélemy sought to prevent Colony from accepting repayment of the Villa Loan (and consequently reversing the foreclosure) by contending that under the terms of the agreements in place between DTFS and Barthélemy, this could not take place without Barthélemy's approval, which it refused to provide. (Defence, Par. 41).

30. The negotiations between Barthélemy and Colony ultimately resulted in Barthélemy's affiliate (LEBV) purchasing the foreclosed assets by buying Colfin, pursuant to a contract dated August 26, 2016. (Defence, Par. 42).

31. Barthélemy is now beneficially interested in and indirectly controls 100% of the Hotel and the three villas. (Defence, Par. 43).

***Defences and Counterclaim***

32. Duet denies DTFS's Hotel Budget Accuracy Warranty was false and that the Hotel Specification Warranty was false (Defence, Pars 51 and 57). Duet also denies that Barthélemy has suffered any loss in respect of any breach of either warranty (Defence, Pars 54

and 61). Duet further maintains that Barthélemy may not recover any such purported loss, as a result of its failure to meet its duty to mitigate. (Defence, Pars 54 and 61). Finally, Duet asserts defenses denying that DTFS breached its alleged obligations to Barthélemy. (Defence, Pars. 74-88).

33. With respect to Duet's counterclaim, it relies, in part, on Clause 20.11 of the 2014 Agreement, which provides that, in the event of a default on the Villa Loan, Barthélemy could do only one of two things: (a) nothing; or (b) it could cure an event of default or pre-pay/redeem all or part of the Villa Loan, with any money paid by Barthélemy on behalf of DTFS being treated as a loan between the joint venture partners, to be repaid in accordance with the detailed mechanics set out in the 2014 Agreement. (Defence, Par. 78). Therefore, Barthélemy did not have the authority to circumvent the contractually agreed upon provisions. (Defence, Par. 79). Moreover, the investment agreements created an implied duty for Barthélemy to take all reasonable steps to allow the development to succeed, and further had an equitable duty to cooperate with DTFS. (Defence, Pars. 81-84).

34. Duet alleges that Barthélemy engaged in an unlawful conspiracy with its affiliate and Nunnelly wherein (a) they all interfered with Duet's negotiations with Colfin to forbear from foreclosing on Duet's pledged shares in DTFS, (b) Barthélemy breached its duties of cooperation under the investment agreements and in equity to see the project succeed for DTFS, by failing to repay the loan, and by further contending that Duet's repayment required its approval – which it refused to authorize, and finally (c) Barthélemy encouraged Colfin to foreclose on the Villa Loan, and upon Colfin's foreclosure – whereby Colfin obtained assets far in excess of the value of the Villa Loan -- purchased Colfin and therefore DTFS's interest in the villas and undeveloped plot and the Hotel project at a fraction of its fair market value. (Defence, Pars. 85-

87, 89-90, 97-98).

*Discovery to Date Supports Relevance of and Need for the Discovery from Colony*

35.     Barthélemy's disclosure in the English Action confirms that it communicated with Colony (including its construction consultant) regarding the Hotel development (including the cost and specification of the same) and Barthélemy's participation in the management and oversight of that development, all of which bears upon whether DTFS breached any of its warranties under the 2012 and 2014 Investment Agreements in the first place, and whether Duet can be held liable for guarantees as to same. Barthélemy's disclosure in the English Action further confirms that: (a) Barthélemy expressed interest in acquiring the villas well before Colfin foreclosed; (b) Barthélemy communicated with Colony during the forbearance regarding Colfin's forbearance, the value of the villas and its interest in acquiring the villas; (c) Barthelemy communicated with Colony regarding Colfin's foreclosure; and (d) Barthélemy communicated with Colony regarding its acquisition of the foreclosed assets. For example:

\*There are e-mails from as early as December 2015, from Nunnelly to Tanner, recounting a conversation with David S. Schwartz, Managing Director of Colony, who noted that (despite the then existing forbearance) Colony had already done the foreclosure analysis and it had concluded that it would likely take the villas over, because the fair market value was in excess of the amount owed. (Fulco Decl., Par. 17(i)). In that same e-mail, Nunnelly noted that Dupré asked him to prepare rough numbers on acquisition of the villas in the event Colfin foreclosed. (Fulco Decl., Par. 17(i)). Again, in that same e-mail, Nunnelly notes that the whole matter would likely play out over the succeeding four months. (Fulco Decl., Par. 17(i)).

\*In a January 2016 e-mail from Tanner to Nunnelly and Dupré, Tanner noted Kevin Moosbrugger of Colony was "selling" the villas to him and that Colony was not optimistic that DTFS could maintain the interest/cost outlays over the following four months. (Fulco Decl., Par. 17(ii)).

\*In an e-mail from Barthélemy's counsel to Colony's counsel, the day before the foreclosure, Barthélemy's counsel notes that Barthélemy's Tanner and Colony's Schwartz suggested that the attorneys speak concerning Colony's prospective enforcement of Duet's share pledges. (Fulco Decl., Par. 17(iii)).

   *In a May 2016 e-mail from Colony's Schwartz to Barthélemy's Nunnelly, concerning the terms of a sale of Colfin to Barthélemy affiliate, Colony unsurprisingly proposed that Barthélemy indemnify it, as it recognized the foreclosure and subsequent sale was all carried out at the direction of Barthélemy, and that Barthélemy stood to enjoy a windfall by acquiring the foreclosed assets for far less than the fair market value, and further avoiding certain financial obligations under the investment agreements. (Fulco Decl., Par. 17(iv)).

36. Barthélemy's real-time communications with Colony, as well as Colony's internal communications on matters pertaining to the development of the Hotel and villas, as well as Colfin's forbearance, valuation of the assets subject to foreclosure, foreclosure and any plan for Colony to sell Colfin to Barthélemy's affiliate all bear upon Duet's defenses and counterclaim in the English Action.

### 28 U.S.C. § 1782

37. 28 U.S.C. § 1782 authorizes this Court to order any person in the District to produce documents for use in a foreign proceeding upon the application of any person with an interest in that proceeding. Specifically, 28 U.S.C. § 1782(a) provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

38. To obtain discovery in aid of a foreign litigation, a petitioner must show: (1) that the person to provide discovery resides or is found in the district where the application is made, (2) that the information sought is "for use in a proceeding in a foreign or international tribunal," and (3) that the petitioner is an "interested person" in the foreign proceeding. 28 U.S.C. § 1782.

39. Duet satisfies each of these requirements, because (1) Colony is organized under Delaware law and is found in this District; (2) the evidence that this action and the Subpoena seeks will be used to support Duet's defenses and counterclaim in the English Action; and (3)

13

because Duet is a party to the English Action it is clearly an interested party.

40. Duet also satisfies the discretionary factors set forth by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).

41. Courts routinely grant § 1782 petitions *ex parte*. Duet is committed to avoiding the imposition of any undue burden on Colony in connection with the proposed subpoena. (Fulco Decl., Par. 17).

42. Having satisfied the legal and factual requirements for a § 1782 application, Duet respectfully requests the Court issue an Order allowing it to serve a subpoena seeking communication by and between the Barthélemy Custodians and the Colony Custodians, as well as Colony's own internal communications. A copy of Duet's proposed subpoena (the "Subpoena") is attached hereto as Exhibit A. And, a proposed order granting the relief sought herein is attached hereto as Exhibit B.

## THE SUBPOENA

43. The Subpoena, a copy of which is attached hereto as Exhibit A, seeks all communications (specifically including electronic) by and among the Barthélemy Custodians and the Colony Custodians, during the period January 1, 2012 to the present, concerning the Hotel, the villas, valuations of the Hotel and the villas, the Villa Loan, the forbearance, the foreclosure, and Barthélemy's purchase of Colfin.

44. Permitting the requested discovery will allow for a full and fair adjudication of the English Action based on all available and relevant information.

## PRAYER FOR RELIEF

WHEREFORE, Duet respectfully requests an Order pursuant to 28 U.S.C. § 1782:

(1)  Granting Duet leave to serve the Subpoena upon Colony; and

(2)  Such other relief as the Court deems just and proper.

                                    OFFIT KURMAN P.A.

                                    */s/ G. Kevin Fasic*
                                    G. Kevin Fasic, Esquire (DE 3496)
                                    1201 North Orange St., Ste 10 East
                                    Wilmington, DE 19801
                                    (302) 351-0901
                                    kfasic@offitkurman.com

Of Counsel:

John Paul Fulco, Esquire
Offit Kurman, P.A.
10 East 40th Street
New York, NY 10016
347-589-8550
jfulco@offitkurman.com

Dated: February 28, 2019